Cunningham, Presiding Judge,
dissenting:
Finding myself unáble to concur either in the reasoning of or the result reached by my associates, and being impressed with the importance of the rule announced in the majority opinion, and the precedent which .it establishes, I have reluctantly concluded that it is my duty to set forth, at some length, my reasons for dissenting.
I shall not encumber this opinion with lengthy quotations from the opinion of the Supreme Court rendered in this,case when it was before that body, as the same has been referred to in the majority opinion, and will be found in 44 Colorado 94, 96 Pac. 978, 104 Pac. 605. Summarized, the opinion of the Supreme Court squarely holds: 1. That Mrs. Terrill *84 held, the property in trust for the creditors of her husband; 2, that in-taking- the property from Mrs. Terrill, Alley wilfully closed his eyes to the facts and circumstances surrounding the transfer of the property from Terrill to his wife. These are findings of fact. Upon these, and other similar findings of fact, the Supreme Court made findings of law to the effect that knowledge of the circumstances, such as Alley had, was equivalent to- actual notice, and that, "In such event, as we have seen, the law assumes that he had actual knowledge of such fraud." Italics, wherever used, are mine. In the circumstances of this case, the Supreme Court announces the rule to be, quoting from' 84 Fed. 86o-:
“Courts of equity d:o not permit a party to' claim any benefits from his own ignorance of facts which he could have learned by exercise of ordinary prudence and diligence.”
The Supreme Court’s Conclusions, if any authority were required to make the same binding upon us, finds ample support in the authorities, case and text.
“Knowledge or implied notice- is equivalent to, and constitutes, participation, where the tiansfer is to one not a .creditor.” 20 Cyc. 471.
“Participation, as the term is used, need! not be by some affirmative action on the part of the transferee in consummating the fraudulent intent of the transferer, but the transferee is a participator in the fraud if he takes the conveyance with actual notice of the grantor’s fraudulent intent, or under circumstances zdhere the law zvill impute to him knowledge of the purpose of the transferer, without his actively taking part in the fraudulent design of the transfer other tizan the taking of it." 20 Cyc. 471 (note). Kansas Moline Plow Co. v. Sherman, 3 Okla. 204, 41 Pac. 626, 32 L. R. A. 33.
Furthermore, the right to subrogation is never granted as a reward fo-r negligence. Fort Dodge Bdlg. Assn. v. Scott, 86 Ia. 431, 53 N. W. 283.
The majority opinion, in so far as it treats of the money paid by Alley to redeem from the mortgage, appears to pro *85 ceed upon the theory that unless one actually enters into a Conspiracy, and by zvord of mouth discusses the intentions and purposes of the one from whom he obtains his title, that there can be no actual participation in the fraud of the grantor. The authorities last cited are opposed to this view.
My brethren may not approve of the opinion handed down by the Supreme Court in this case, but they ought to be bound by it, and they ought to cheerfully accept it as the law of this case; they have no more right to silently reverse an opinion of the Supreme Court, or ignore it altogether-, than they have to, in terms, announce their dissent, and! thus refuse to follow it. My conclusion therefore is that, if for no- other reason than that the Supreme Court has laid down rules and made findings, both of fact and of law, which are binding upon us, the majority opinion in this case is wrong. But I find myself in hearty acco-rd with the conclusions of the Supreme Court.
My position is that under the decision of the Supreme Court in this case, Alley was guilty of actual fraud, or guilty of such wilful carelessness as that the law imputes to him actual knowledge, and even the majority opinion' nowhere combats the universal rule that one guilty of actual fraud may not invoke ’the doctrine of subrogation. On this point, at least, the authorities are harmonious.
The relief extended to Alley by the majority opinion presupposes a finding that he did not have actual knowledge; that he acted in good faith. These findings are squarely in the teeth of the opinion of the Supreme Court, as I read it.
I am persuaded that my associates have reversed the rules that apply, or ought to- apply, in cases of this sort, viz: that:
“The burden is always on one who- claims this equity of subrogation to show that he is entitled: to it.” — Sheldon on Subrogation (2nd Ed.) sec. 11.
“And also- that the relief can be granted to him without prejudice to the rights of innocent parties.” — Harris on Subrogation, p. 561.
*86 That:
“To entitle a party to subrogation, his equity must be strong, and his c'ase clear. In such applications great care should be taken by the court that the subrogation will work no injustice to the rights of others.” — Knoufs Appeal, 91 Penn. St. 78; Lloyd v. Galbraith, 32 Penn. St. 103; Keeley v. Cassiday, 93 Penn. St. 318;
That:
“The rights of one seeking subrogation must have greater equity than those who' oppose him; the burden being upon the would-be subrogee to establish his right, for subrogation will be ordered only in a clear case of pure equity. The right is never allowed one who would thereby reap .advantage in any way from his own wrong-doing. * * * As its purpose is only to prevent fraud or subserve justice, it will not be applied where its exercise would promote injustice, and thus can be applied only with a due regard to the legal and equitable rights of others.” — 37 Cyc. 371; McNeil v. Miller, 29 W. Va. 483, 2 S. E. 335:
That:
“The party seeking such relief must show a superior equity, for the equities being equal, the law will be allowed to take its course.” — Pritchett v. Jones, 87 Ala. 317, 6 So. 75.
The majority opinion appears to proceed upon the theory that the burden was on Tibbetts to satisfy the chancellor that Alley had been guilty of fraud, and that his fraud would work to the injury of Tibbetts. But even under this perversion of the rules, as indicated by the above quotations, the majority opinion is wrong, for, as I shall presently show, the record demonstrates that Tibbetts will suffer injury.
In the majority opinion attention is called to the difficulty which would have confronted Alley, had he attempted by inquiry to ascertain whether or not Tibbetts’ contentions were well-founded. There are two all-sufficient answers to this: 1, he could have refrained! from purchasing the land until that *87 question was settled; he knew that there was a-n issue or question on that point, and if he found it difficult to get at the facts, no hardship would have resulted to him had he kept out of the controversy; 2, the Supreme Court has found (44 Colo. 104, 196 Pac. 978, 104 Pac. 605) that if Alley:
“Had pursued these investigations with reasonable skill and diligence, he would have ascertained that the consideration which Gray gave for the property, was his unsecured promissory note, and the Consideration which Gray received for the property when he conveyed it tp Mrs. Terrill was the same note, which was still in the hands of Mr. Terrill. He would also have discovered the existence of the judgment in favor of appellant. He would thus have learned that the conveyances leading from Terrill to- Mrs. Terrill were without consideration and void as to creditors, or that the consideration for the conveyance from Gray to Mrs. Terrill was paid by Terrill, which resulted in Mrs. Terrill’s holding the property subject to the rights of her husband’s creditors; that in either event the transaction was fraudulent so far as it affected the creditors. Aside from the knowledge possessed' by the attorney, there were sufficient facts known to Alley before the purchase was consummated and the purchase price paid, to‘ put him upon inquiry, and to charge him with knowledge of facts zvhich he might have acquired if he had exerted himself to the degree of ordinary diligence and prudence in making inquiry
Moreover, my brethren appear to be oblivious to the difficulties that would confiont Tibbetts, were he to attempt to establish actual fraud on the part of Alley. Paraphrasing from the original opinion: “He (Tibbetts) might have examined the records thoroughly, and made every effort to obtain information concerning the motives of Alley and the Terrills in giving the deed, and still, the limit of information so acquired would have been that Alley claimed and contended that the deed from Mrs. Terrill to him was given for a good consideration. It is more than probable that the question of *88 intent or evil design on the part of Mrs. Terrill or Alley, (if there was any) in giving the deed, would have remained a closed secret to Tibbetts. He might have interrogated them concerning such intention and design, and' in all probability would have failed to elicit any information from them «on the subject. It is certainly a reasonable presumption that neither Mrs. Terrill nor Alley would have taken him into their confidence and divulged to him their fraudulent design (if they entertained one) and purpose in executing the deed.” It is worthy of note that we have in this case no evident e whatever that Alley paid off this mortgage, to the lien of which the majority opinion subrogates him,.with his own money, or in good faith, except his unsupported statement. It is conceded in the majority opinion, in treating of the improvements made by him, that his conduct was most extraordinary. But it was no more unusual in this respect than in respect to- buying- into this controversy, and paying off the mortgage before the maturity of the debt it secured. The unlimited opportunity for grave injustice being thus done to Tibbetts ought to make the court doubly cautious in the application of the benign doctrine of subrogation, for the books all hold that it is purely a benevolent rule. There is other evidence to be found in the majority opinion of extreme tenderness towards the supposed rights of Alley, for the writer of that opinion even appears to commiserate with Alley on the loss of the improvements which the majority opinion takes from him; on the sum of money which he says he paid to Mrs. Terrill in cash, and even on the attorney fees and costs which he has paid out in this Case! What these items have to do with the matter is not clear; nor is it plain why sympathy should be extended to Alley for the money which he has voluntarily and contumaciously paid out in the way of costs and attorney fees, while overlooking similar expenditures which he has wrongfully forced Tibbetts to' incur.
There are only two authorities that are cited in the majority opinion which, to' my mind, sufficiently resemble the in *89 stant case in their facts to require notice, and they may be readily distinguished. My associates appear to rely largely upon the case of Tompkins v. Sprout, 55 Calif. 31. It is apparent upon a reading of that opinion that the Supreme Court made much of the express finding of the trial court that:
“The defendant paid full value for the land and ‘did not have actual knowledge of the fact that' the conveyance from Charles to Gustav was fraudulent.’ ’’
Here, if Alley did not have actual knowledge, he had what the Supreme Court has ruled was the equivalent thereto, and therefore, the Supreme Court says the law imputes to him actual knowledge. Proceeding upon and supplementing this finding by the trial court, the California Supreme Court, on p. 36, says:
“The Court below expressly found that the defendant had no actual knowledge that the transfer from Charles to Gustav Peterson was fraudulent, and that the conveyance from the latter to the defendant was constructively fraudulent only. In such case, a Court of equity will protect the purchaser as well as the creditor, where, as here, both can be protected zvithout injury to either.”
In other words, I take it that the California Supreme Court found that there was ample equity in the property to cover the claims of both parties. At least there is in the opinion nothing toi negative this presumption. Another case much relied upon in the majority opinion (Lynch v. Burt, 132 Fed. 417, 67 C. C. A. 305), may be distinguished in the same manner as the California opinion.
The land in this case, with all the personal property thereon situate belonging to Mrs. Terrill (including household furniture, live stock, hay, etc.) was sold to Alley for $7,000. With the $2,000 deducted on account of the homestead right mentioned in the majority opinion, and $3,000 on account of the mortgage debt, it is not probable there will he anything remaining as the result of an execution sale to apply on the *90 Tibbetts’ judgment which, .fourteen years ago amounted to $6,378, besides costs, and now must amount to approximately $15,000.
The majority opinion is inconsistent in denying to Alley the value of his improvements, while allowing him for the money he advanc'ed in redeeming the land from the mortgage. The authorities make no distinction between improvements, and money applied to the liquidation of liens whic'h were upon the land at the time of the purchase, and especially in this case ought there to- be no distinction made, since it was stipulated that the amount claimed by Alley by way of improvements was $1,700; that they were permanent and necessary and enhanced the value of the property. In the majority opinion it is said that Alley, “expended his money in improving the property, well knowing that Tibbetts was vigirously following up his claim and contention that Mrs. Terrill’s title was fraudulently obtained, and was invalid against a judgment lien. * * * Under such circumstances, common prudence would have kept him from expending any money on the premises other than was absolutely necessary to prevent the loss of the same, until after the claims of Tibbetts had been finally .determined. * * * He made such improvements at his own peril, SO' far as Tibbetts is concerned, and ought to suffer the consequences.”
With this finding I fully agree; but did he not know, when he paid out his money by way of redeeming the land from the mortgage, that “Tibbetts was vigorously following up his claim and contention that Mrs. Terrill’s title was fraudulently obtained?” There is nothing in the record to show when he made the improvements with reference to when he paid out the money by way of redeeming from the mortgage, but the record does disclose that he paid out a substantial part of the money after this suit was started, and a year before the note zi/as due, that is to say, a year before the mortgage could have been foreclosed or his title jeopardized.
*91 In denying to Alley what he had paid out for necessary improvements, which enhanced the value of the property by $1,700, Judge Hurlbut quotes the following' from Strike v. McDonald, 13 Har. & G. (Md.) 142, at 193 :
“The quoted passage Sugd. 525, furnishes a sound, practical rule for rejecting claims, for improvements, where the transaction is tainted with fraud. It is expressed nearly m these words: If a man has acted fraudulently, and is conscious of a defect in his title, and with that conviction on his mind expends a sum of money in improvements, he is not entitled to avail himself of it.”
Having quoted, without qualification, the above language from the Maryland case, I suppose my associates concede its applicability to the defendant in error, Alley. Then, we have this remarkable conclusion: that where a transaction is tainted with fraud, and where a man has acted fraudulently, and is conscious of a defect in his title, and with thar conviction on his mind, expends a sum of money in paying off a mortgage, he is entitled to avail himself of the benevolent doctrine of subrogation, but where he makes valuable improvements, which are necessary to the estate, and which actually enhance the value of the estate, he is not!
The highest court of this Country has clearly indicated that as between improvements placed upon land; purchased under the circumstances presented by this case, and money paid out to- lift an encumbrance therefrom, the law makes no distinction; and that court has expressly ruled that a man who has acted fraudulently, “and with that Conviction on his mind,” can recover for neither of these items. In Railroad Co. v. Soutter, 13 Wall, 517, 20 L. Ed. 343, Mr. Justice Bradley, speaking- for the court, uses this language:
“Was it ever known that a fraudulent purchaser of property, when deprived of his possession, could recover for his repairs or improvements, or for encumbrances lifted by him whilst in possession? If such a case Can be found in the books, we have not been referred to- it. Whatever a man *92 does to benefit an estate under such circumstances, he does in his own wrong. He can not get relief by coming into a court of equity.” — 20- Cyc. 470; Gilbert v. Hoffman, 2 Watts (Pa.) 66, 26 Am. Dec. 103; Guckenheimer v. Angevine, 81 N. Y. 394; Bump on Fraudulent Conveyances, § 198; Weiser v. Kling, 38 App. Div. 266, 57 N. Y. Supp. 48; Roller Mills v. Ward, 6 N. D. 317, 70 N. W. 271; Seivers v. Dickover, 101 Ind. 495; Goble v. O'Conner, 43 Neb. 59, 61 N. W. 131; Beidler v. Crane, 135 Ill. 99, 25 N. E. 655, 25 Am. St. Rep. 349; Sands v. Codwise, 4 Johns. (N. Y.) 536, 4 Am. Dec. 305.
There is yet another reason which, in my judgment, ought to bar Alley from the right to invoke the doctrine of subrogation, at least as to $1,000 of the sum which the majority of the opinion allows him; the $3,000 which the majority opinion concludes he ought to recover, was represented ‘by three promissory notes. The last note, of $1,000, was paid by him (if paid at all) in two installments, the ñrst being paid some eighteen months before the maturity of the note, and the last installment a yeair before maturity, and five months after this action was brought. I have discovered no authority which permits one, under circuinstances of this kind, to invoke the doctrine of subrogation.
There is still another reason which is, in and of itself, sufficient to defeat the claims of Alley to subrogation, and that is, that at the time he filed his original answer in this case, to-wit, March 21, 1903, he had paid, -as the record shows, every dollar that he now claims by way of 'subrogation, i. e., he had, according to his evidence, extinguished the mortgage by paying all of the notes which it was given to- secure, save and except a small balance of less than $350 on the last of the three notes, and this balance was paid before the issues in the case were joined. In the original answer no -claim whatever is made by Alley that he had paid! off the mortgage and desired that it be kept alive for his use and benefit; nothing whatever is said by him, or on his behalf, concerning the question of subrogation, until the Supreme Court, in April, 1908, (some *93 five years after he filed his original answer) handed down its opinion in this, c'ase. Then, for the first- time, and in that court, he sought, by motion, to claim and have enforced in his behalf the doctrine of subrogation. The Supreme Court very properly refused to consider his demand, because, as it says, “there is nothing in the pleadings concerning these encumbrances.” Whereupon, he goes back to the District Court, and on September 7, 1909, after a lapse of seventeen months more,- files his supplemental answer, setting up the .facts upon which he now bases his claim of right to invoke the doctrine of subrogation.' In other words, for mare than- six years, while this litigation was pending, he made no claim or mention that he had paid off the mortgage and desired to- be subrogated to the rights of the mortgagee. On the contrary, seven times in his original answer he insists upon the illegality and utter want of virtue in Tibbetts’ lis pendens execution, etc., and upon that defense alone went forward to- trial. The original answer of .Alley, considered in connection with the opinion rendered by the Supreme Court in this Case, conclusively shows that the only mistake that Alley made was a mistake of law, not a mistake o-f fact, and the rule that one may not invoke the doctrine of subrogation when his only contention is that he has made a mistake in law, is too elementary to- require the citation o-f authorities.
Innocence of actual fraud may, under certain circumstances, entitle a purchaser of mortgaged land who pays off a debt thereon to the right of subrogation, but my associates seem to think it must do- so-, regardless of the grossest and most wilful negligence, and in the face of the clearest possible proof, of waiver.
“Subrogation, being an equity springing from the relation between the parties, and created and enforced for the benefit and protection of the one in whose favor it is originated, may be asserted or waived at pleasure, either expressly or by implicaton.” — 37 Cyc. 383.
*94 “The right of subrogation may be lost by the waiver of the party entitled to it. * * * A long delay without action will be fatal to a claim of subrogation — Sheldon on Subrogation, Sec. 41.
Alley’s right of subrogation, if any he had,' accrued when he paid the last installment on the mortgage.
“The surety’s right of subrogation accrues upon his payment; and as to his principal the statute then begins to run against him, and he should then call at once for the securities, if he desires to be subrogated to them.” — Sheldon on Subrogation, Sec. no.
He paid the last installment January 5, 1903. Six years and eight months elapsed before he attempted; to assert his alleged right of subrogation. His supposed right was then barred by the statute of limitations.
“The right of subrogation will be barred by the statutory period of limitations like any other right.’V — Sheldon on Subrogation, Sec. no.
If it be said that Tibbetts, by not pleading the statute of limitations, waived his rights to invoke the same, I reply: Alley had waived his right to invoke the equitable rule of subrogation long before Tibbetts was called upon to plead the statute of limitations. But, the truth is, Alley has never asked; to- be subrogated to the rights of the mortgagee. The prayer of his original answer reads as follows:
“Wherefore, this defendant prays that he go hence without day, with his costs herein expended.”
He does not even pray for general equitable relief. And his amendment, filed September 7, 1909, contains no prayer; it is simply an insert in the original answer. So', the climax of Alley’s good luck in this piece of litigation comes in the form of a relief for which he has not asked! Having chosen his weapons of defense (specific and general denials as to the legality of Tibbetts’ claims) and; having signified his satisfaction with the battlefield, he goes forth to a seven-year war, at the end of which, having lost everything for which he con *95 tended, instead of capitulating, he draws an ancient and forgotten weapon — a stale, so-called equity — and renews the fight, achieving in the end, if the majority opinion shall stand, a signal victory. If he has not already done so, Alley ought to adopt as his coat of arms a rusty sword, with the legend emblazoned thereon, “If at first you don’t succeed, try, try again.” So far as I am now able to recall, this is the first instance where a litigant has successfully invoked his own laches and his mistake of law to arrest the statute of limitations.
From the time the Supreme Court handed down its opinion in April, 1908, until this good hour, Alley has held Tibbetts at bay by advancing an issue or contention which might just as well have been presented and determined on' the first trial, and all this time he has benefited by retaining possession of the land, (for the use of which he is not required to account) thus preventing its sale under execution. In the meantime, Tibbetts’ judgment has more than doubled, and can now never be made by the sale of the land. In Lake County v. Johnson, 31 Colo. 184) 71 Pac. 1106, our Supreme Court expressly ruled that a judgment is conclusive respecting omitted defenses, as well as defenses that were in fact offered, if the omitted defenses might have been plead in the action in which the judgment was obtained.
“A "valid judgment for plaintiff definitely and finally negatives every defense, objection or exception which might and should have been raised against the action; and this is true not only with respect to further or supplementary proceedings in the same cause, but for the purpose of every 1 subsequent suit between the same parties, whether founded upon the saute or a different cause of action.” — 23 Cyc. 1196.
The above quoted text from Cyc. is supported by hundreds of citations, from practically every state in the Union.
“The rule is often stated in general terms that a judgment is conclusive not only upon the question actually contested and determined, but upon all matters which might have *96 been litigated and decided in that suit; and this is undoubtedly true of all matters properly belonging to the subject of the controversy and within the scope of the issues, so that each party must make the most of his case or defense, bringing forward all his facts, grounds, reasons or evidence in support of it, on pain of being barred from showing such omitted matters in a subsequent suit; and it is also true that where the sec'ond suit is upon the same cause of action, all matters which might have been litigated are conclusively settled by the judgment; and, that generally the estoppel applies where matters which should have been urged as a defense in- the first suit are attempted bo be made the basis of a second action, or, according to some of the authorities, where defenses which were available against an adverse claim in the first suit, but not then set up-, are sought to be used in a second action, either by way of defense, of as the foundation of a claim for relief.” — 23 Cyc. 1295.
Lake County v. Johnson, supra, is cited as supporting. and¡ it does support, the last rule announced in the above quotation.
It is true that Tibbetts, in this case, has not interposed estoppel or res ad judicata as a defense, but his failure in this respect does not impress me as more serious than the failure of Alley for more than six years to claim the right of subrogation, and his entire failure, up to the present time, to even ask for that right.
The majority opinion sends this case back, “for further proceedings as the parties may be advised.” I shall be greatly surprised if Alley does not incubate another time-consuming alleged equity, and project this litigation five years or more further into the future, the while he holds possession of the property and; receives the income therefrom.
It is my conclusion that the judgment of the trial court should be reversed, unqualifiedly, and the case remanded with instructions to carry out the directions of the opinion of the *97 Supreme Court, permitting Alley what was awarded him by that court, and nothing more.
Decided April 13, A. D. 1914.
Rehearing denied May 11, A. D. 1914.